Blair W. Will (State Bar No. 224929)
Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.
bwill@hallestill.com
1600 Stout Street, Suite 1100
Denver, Colorado 80202
Telephone:   (720) 420-7583
Facsimile:   (918) 594-0505

Attorneys for Plaintiff
Gold Mining LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLD MINING LLC, a Wyoming Limited Liability Company,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>MINTIRO INVESTMENT HOLDINGS (PTY) LTD, a South African Corporation, THOMAS O'BRIEN TOLKEN, an individual; AND DOES 1-20,<br><br>　　　　　Defendants. | Case No.: 2:25-cv-01211<br><br>**COMPLAINT FOR BREACH OF CONTRACT, FRAUD, CONVERSION, AND UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Gold Mining, LLC, for its claims against Defendants Mintiro Investment Holdings (PTY) Ltd, and Thomas O'Brien Tolken, alleges and states as follows:

## JURISDICTION

1. Gold Mining LLC ("Gold Mining" or "Plaintiff") is a limited liability company, formed under the laws of the State of Wyoming, with its principal place of business located in the State of Wyoming.

2. Defendant Mintiro Investment Holdings (PTY) Ltd. ("Mintiro") is a South African corporation, with its principal place of business located in Pretoria, South Africa.

3. Defendant Thomas O'Brien Tolken ("Tolken"), is, on information and belief, a citizen of South Africa, and is legally responsible and liable for the acts, omissions and events referred to in

---

GOLD MINING LLC'S COMPLAINT FOR BREACH OF CONTRACT, FRAUD, AND CONVERSION

- 1 -

this Complaint. (Defendant Mintiro and Defendant Tolken are referred to herein collectively as the "Defendants").

4. Gold Mining is informed and believes and based upon information and belief alleges that DOES 1-10 are, and at all times herein mentioned, were, corporations, partnerships, limited liability companies, or other business entities who were and are legally responsible for the acts, omissions and events referred to in this Complaint.

5. Gold Mining is informed and believes and based upon information and belief alleges that DOES 11-20 are, and at all times herein mentioned, were, individuals who were and are legally responsible and liable for the acts, omissions and events referred to in this Complaint.

6. Gold Mining is ignorant of the true names and capacities of Defendants sued herein as DOES 1-20, inclusive, and therefore sues such Defendants under such fictitious names. Gold Mining will seek leave to amend this Complaint to allege their true names and capacities when the same have been ascertained.

7. Gold Mining is informed and believe and based on such information and belief allege that Defendants, and each of them, are and at all times mentioned herein were the alter egos, agents, employees, partners, joint-venturers, co-conspirators, owners, principals and employers of the remaining Defendants, and each of them, and are, and at all times mentioned herein were, acting within the course and scope of that agency, employment, partnership, conspiracy, ownership or joint venture. Gold Mining further alleges that the acts and conduct herein alleged of each such Defendant were known to, authorized by, and/or ratified by the other Defendants, and each of them.

8. This Court may properly exercise jurisdiction over both the parties and the subject matter of this action pursuant to 28 U.S.C. § 1332, in that diversity of citizenship exists and the amount in controversy is in excess of Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest and costs.

9. Venue is properly laid in this District pursuant to 28 U.S.C. §§ 1391(a)(c).

## BACKGROUND AND FACTUAL ALLEGATIONS

10. Gold Mining is engaged in the business of mineral exploration, development, and gold mining operations. Gold Mining has substantial mining interests and rights to gold-bearing properties located in the United States.

11. Defendant Tolken is an individual with purported expertise in financial services, mineral exploration, and the application of advanced drone technology for the detection of gold and mineral deposits. Defendant Tolken made both oral and written representations to Gold Mining, asserting that

he had the necessary skills, industry connections, and technological capabilities to provide specialized financial and exploratory services. In further support of Defendant Tolken's efforts to secure Gold Mining's engagement of Defendant Mintiro for these services, Defendant Tolken provided Gold Mining with a "Company Profile" document detailing the financial and exploratory capabilities of Defendant Mintiro. The services outlined in the Company Profile document aligned closely with Gold Mining's needs and served to further induce Gold Mining to engage Defendants for the requested services.

12. On or around September 18, 2024, Gold Mining and Defendant Mintiro entered into a written Agreement (hereinafter, the "EDGMIH-1" or the "Agreement") (Exhibit A), whereby Defendant Mintiro, through Defendant Tolken, agreed to secure funding for the exploration, development, and exploitation of Gold Mining's gold mining assets. Specifically, Defendants agreed to secure funding for Gold Mining's operations in exchange for $370,000.00 in fees (60% due upon execution of the EDGMIH-1 and 40% due upon completion of documentation before submission), a five percent (5%) equity stake in Gold Mining, and ten percent (10%) share of the gross profits from the platform transaction.

13. On or around September 26, 2024, Gold Mining and Defendant Mintiro entered into an Equipment Lease Agreement ("Lease") (Exhibit B), under which Gold Mining agreed to lease an allegedly advanced drone equipped with sophisticated scanning technology purportedly capable of detecting and evaluating gold and mineral deposits for potential exploitation, in exchange for monthly rental payments.

14. Pursuant to the terms of both Agreements, Defendants expressly warranted that they had the requisite experience, financial contacts, and technological resources to successfully perform the desired services. Defendants further assured Gold Mining that they had a proven track record of obtaining investment capital for mining ventures and that their proprietary drone-based mineral detection technologies were capable of performing the desired exploratory services.

15. Shortly thereafter, in reliance on Defendants' representations and eager to begin operations, Gold Mining expended approximately $77,000.00 to undertake a business trip to meet with Defendants in Northern California for a demonstration of Defendant Mintiro's drone. During the meeting Defendant Tolken provided a basic tutorial for operating the drone and when asked about the scanning capabilities, Defendant Token merely reiterated that the drone was capable of fulfilling Gold Mining's exploratory needs.

16. Gold Mining fully performed its obligations under the EDHMIH-1 and Lease, including timely payments and provision of necessary resources to Defendants. Namely, Gold Mining provided Defendants with access to Gold Mining's proprietary geological data, site locations, and confidential business plans, and transferred $370,000.00 to Defendants all in conformance with the terms of the EDHMIH-1.

17. Yet, Defendants failed to meet their obligations under the EDHMIH-1 and the Lease. Specifically, Defendants, and each of them, did not secure the required funding or investment for Gold Mining's mining projects. Defendants also failed to demonstrate the deployment of any functional drone technology capable of locating gold or mineral deposits as promised by Defendants.

18. In fact, Defendant Mintiro failed to perform every material term of the EDHMIH-1, including: (i) developing and presenting a bankable financial model to European banks to secure underwriting for Gold Mining's mining assets; (ii) using an MT542[1] on behalf of Gold Mining to monetize the mining assets through a banking trading platform; and (iii) facilitating funding for Gold Mining's mining operations.

19. Furthermore, Defendant Mintiro failed to perform every material term of the Lease, including providing rental equipment (a drone), that was capable of detecting and evaluating gold and mineral deposits for potential exploitation.

20. Concerned, Gold Mining made multiple inquiries and demands for performance under the EDHMIH-1 and the Lease, but Defendants either provided vague assurances or failed to respond altogether.

21. Upon further investigation, Gold Mining discovered that Defendants lacked the necessary financial relationships to perform Defendants' obligations under the EDHMIH-1.

22. Concurrently, Gold Mining learned that Defendants have not developed, nor do Defendants own, any proprietary drone technology for mineral exploration.

23. Upon discovering Defendants' inability to perform, Gold Mining demanded a return of its property, which was again met with silence from Defendants.

24. As a direct result of Defendants' failure to perform and misrepresentations, Gold Mining suffered significant financial losses, including lost opportunities for funding, delays in mining operations

---

[1] An MT-542 is a financial message format used in the securities industry for delivering instructions concerning the delivery of securities. It plays a critical role in ensuring the smooth operation of securities transactions between financial institutions, custodians, and clearinghouses.

resulting in at least $10,000,000.00 in opportunity losses, the actual loss of $370,000.00 in converted fees wrongfully withheld by Defendants, and at least $77,000.00 in wasted expenditures.

25. Defendants' fraudulent conduct and material breaches of the EDHMIH-1 and the Lease have caused Gold Mining substantial damages. Gold Mining now seeks relief for breach of contract, intentional fraudulent misrepresentation, fraudulent concealment, conversion, unjust enrichment, and any other claims as may be appropriate under applicable law.

**FIRST CLAIM FOR RELIEF**
**(Breach of contract – the EDGMIH-1 Agreement)**

26. Gold Mining refers to Paragraphs 1 through 25 above, and incorporates the same herein by reference as though fully set herein.

27. Gold Mining and Defendants entered into a contract on September 18, 2024, the ("EDGMIH-1") pursuant to which Defendant Mintiro, through Defendant Tolken, agreed to (i) secure funding for the exploration, development, and exploitation of Gold Mining's gold mining assets, and (ii) utilize advanced drone technology to locate and assess gold and mineral deposits for potential exploitation. Specifically, Defendant Mintiro agreed to: (i) develop and present a bankable financial model to European banks to secure underwriting for Gold Mining's mining assets; (ii) use an MT542 on behalf of Gold Mining to monetize the mining assets through a banking trading platform; and (iii) facilitate funding for Gold Mining's mining operations, in exchange for $370,000.00 in fees, a five percent (5%) equity stake in Gold Mining, and ten percent (10%) share of the gross profits from the platform transaction.

28. Gold Mining complied with all its obligations under the EDHMIH-1 by, inter alia, transferring $370,000.00 to Defendants.

29. The actions of Defendants as described herein constitute a material breach of the EDGMIH-1 Agreement.

30. As a direct and proximate result of the breach of contract by Defendants, Gold Mining has suffered damages in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest in an amount not yet ascertained, and will be proven at time of trial.

//
//
//
//

## SECOND CLAIM FOR RELIEF
### (Breach of contract – the Equipment Lease Agreement)

31. Gold Mining refers to Paragraphs 1 through 30 above, and incorporates the same herein by reference as though fully set herein.

32. Gold Mining and Defendants entered into a contract on September 26, 2024, the ("Lease") pursuant to which Gold Mining agreed to lease an allegedly advanced drone equipped with sophisticated scanning technology purportedly capable of detecting and evaluating gold and mineral deposits for potential exploitation, in exchange for monthly rental payments.

33. Gold Mining complied with all its obligations under the Lease by, inter alia, transferring monthly rental payments to Defendants.

34. The actions of Defendants as described herein constitute a material breach of the Lease.

35. As a direct and proximate result of the breach of contract by Defendants, Gold Mining has suffered damages in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest in an amount not yet ascertained, and will be proven at time of trial.

## THIRD CLAIM FOR RELIEF
### (Fraud – Intentional Misrepresentation)

36. Gold Mining refers to Paragraphs 1 through 35 above, and incorporates the same herein by reference as though fully set herein.

37. Gold Mining alleges, upon information and belief, that Defendants misrepresented to Gold Mining that they were capable of securing underwriting for Gold Mining's mining assets, monetize the mining assets through a banking trading platform, and facilitating funding for Gold Mining's mining operations.

38. Gold Mining further alleges that in fact Defendants knew that they could not perform and intended to abscond with Gold Mining's proprietary geological data, site locations, confidential business plans, and property.

39. Defendants' misrepresentations were material. Per the EDHMIH-1, Defendants misrepresented their capabilities and/or intentionally deceived Gold Mining into believing that services were rendered by producing fabricated financial models and banking documents, showcasing their alleged expertise.

40. Defendants intended to induce Gold Mining to rely on Defendants' misrepresentation to have Gold Mining enter into the EDHMIH-1. Defendants knew that by stating that it could perform the

aforementioned financial and exploratory services that Gold Mining would execute the EDHMIH-1 and provide substantial payment to Defendants per the terms of the EDHMIH-1.

41. Gold Mining reasonably relied upon the representations Defendants made while executing the EDHMIH-1.

42. Gold Mining was justified in relying upon Defendants' representations that they were capable of providing the aforementioned financial and exploratory services because Defendants maintained a reputation as an expert in the industry at the time of executing the EDHMIH-1.

43. As a direct and proximate result of Gold Mining's reliance on Defendants' misrepresentations, Gold Mining has suffered damages in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest in an amount not yet ascertained, and will be proven at time of trial.

**FOURTH CLAIM FOR RELIEF**
**(Fraud – Concealment)**

44. Gold Mining refers to Paragraphs 1 through 43 above, and incorporates the same herein by reference as though fully set herein.

45. Defendants concealed material financial documentation from Gold Mining that it is obligated to provide under the EDHMIH-1.

46. Defendants has misled Gold Mining by representing to Gold Mining that Defendants were capable of performing their obligations under the EDHMIH-1.

47. Defendants, through its concealment of material facts, has prevented Gold Mining from discovering the concealed or suppressed facts.

48. Defendants knowingly concealed and failed to disclose the financial documentation and this falsity persists to the detriment of Gold Mining and its interests under the EDHMIH-1.

49. Upon information and belief, Gold Mining alleges that Defendants intentionally concealed or suppressed the financial documentation with the intent to defraud Gold Mining and induce Gold Mining to proceed with the disclosure of proprietary, confidential information, and the transfer of funds under the EDHMIH-1.

50. At the time the Parties executed the EDHMIH-1, Gold Mining was unaware of the concealed or suppressed facts and would not have executed the EDHMIH-1 if Gold Mining had known the facts.

51. As a direct and proximate result of Gold Mining's reliance on Defendants' concealment, Gold Mining has suffered damages in excess of Seventy-Five Thousand Dollars ($75,000.00), plus

interest in an amount not yet ascertained, and will be proven at time of trial.

## FIFTH CLAIM FOR RELIEF
### (Conversion)

52. Gold Mining refers to Paragraphs 1 through 51 above, and incorporates the same herein by reference as though fully set herein.

53. Defendants have obtained property from Gold Mining to which they have no legal claim as set forth herein.

54. Gold Mining had demanded the return of the property—principally its investment in conformance with the EDHMIH-1, along with reimbursement for travel expenses—from Defendants.

55. Defendants have refused to return Gold Mining's property.

56. Therefore, by virtue of the actions complained of herein, Defendants have wrongfully converted Gold Mining's property.

57. As a result of Defendants' conversion, Gold Mining has been actually damaged in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest in an amount not yet ascertained, and will be proven at time of trial.

58. Defendants' actions were performed intentionally, with malice, and/or with reckless disregard to the rights of Gold Mining. As a result, Gold Mining is entitled to an award of exemplary damages.

## SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment)

59. Gold Mining refers to Paragraphs 1 through 58 above, and incorporates the same herein by reference as though fully set herein.

60. Defendants were enriched by Gold Mining's investment of property and services.

61. Defendants' enrichment was at the expense of Gold Mining who lost its property and the value of its services without reasonable compensation.

62. It would be unjust for Defendants to retain the benefit of their enrichment because that enrichment was obtained unlawfully as set forth herein.

63. Therefore, Defendants should be required by the Court to disgorge not only Gold Mining's property, but all profits and interest obtained on that property—if any.

## JURY TRIAL DEMAND

Gold Mining hereby demands a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure.

**PRAYER FOR RELIEF**

WHEREFORE, Gold Mining prays that it be granted judgment in its favor and against Defendants as follows:

1. Actual damages on its claims of breach of contract in an amount to be proven at trial, which is in excess of Seventy-Five Thousand Dollars ($75,000.00);

2. Actual damages on its fraud claim in an amount to be proven at trial;

3. Actual damages on its conversion claim in an amount to be proven at trial, which is in excess of Seventy-Five Thousand Dollars ($75,000.00);

4. Damages for opportunity losses in excess of Ten Million Dollars ($10,000,000.00)

5. Exemplary damages on its fraud claim in an amount to be proven at trial;

6. Exemplary damages on its conversion claim in an amount to be proven at trial;

7. An award of pre-judgment and post-judgment interest;

8. An award of the costs of this action, including reasonable attorneys' fees as allowed by law; and

9. Such other relief as the Court deems just and proper

DATED: February 12, 2025                    Hall Estill

                                                 By: */s/Blair W. Will*
                                                      Blair W. Will

                                               Attorney for Plaintiff
                                             GOLD MINING LLC

# EXHIBIT A

## "Agreement"

# AGREEMENT

Code: EDGMIH-1

This Agreement is entered into as of the latest date of signature below, by and between:

- "Gold Mining LLC", a Wyoming corporation (reg. number 2020-000942129) represented by Alexander Dekhtyar (CEO), hereinafter referred to as "GOLD MINING LLC,"

and

- "Mintiro Investment Holdings (PTY) Ltd," a company registered in South Africa (Registration Number: 2018/550625/07), represented by T.O. Tolken, hereinafter referred to as "Mintiro."

"We," "us," and "our" refer to both parties and their respective Affiliates.

NOW, THEREFORE, the parties agree as follows:

## 1. OBJECTIVES

GOLD MINING LLC seeks to engage Mintiro to collaborate in securing funding for the exploration, development, and exploitation of its gold mining assets.

## 2. COMMENCEMENT AND DURATION

This Agreement shall become effective upon signature by the last party to sign (the "Commencement Date") and will remain in effect indefinitely unless:

- Either party terminates the Agreement by providing written notice. Such notice must specify a termination date or

- The Agreement is terminated under Clause 6 (Termination).

## 3. AGENCY

No party shall represent itself as the agent or representative of the other party except as expressly stated in this Agreement. Any agency relationship requires prior written consent from the affected party.

Nothing in this Agreement shall be construed to create a joint venture or partnership between the parties.

## 4. ROLES AND RESPONSIBILITIES

- "Mintiro's Responsibilities:"

- Develop and present a bankable financial model to European banks to secure underwriting for GOLD MINING LLC's mining assets.

- Use an MT542 on behalf of GOLD MINING LLC to monetize the mining assets through a banking trading

Page **1** of **4**

platform and facilitate funding for GOLD MINING LLC's mining operations.

- "GOLD MINING LLC's Responsibilities:"

- Pay Mintiro a fee of USD 250,000.00, split into two payments:

- 60% ($150,000.00) upon signing of this Agreement.

- 40% ($100,000.00) upon completing documentation before submission to the bank.

- Payment will be made to the following account:

- "Account Name:" Mintiro Investment Holdings (PTY)

- "Bank Name:" Nedbank

- "Account No.:" 1204911894

- "Branch Code:" 16214500

  "SWIFT code for Nedbank:" NEDSZAJ

- "Account Type:" Business Enabler

- "Country:" South Africa

Mintiro, or its nominee, will also receive:

- A 5% equity stake in GOLD MINING LLC, and

- A 10% share of the gross profits from the platform transaction, to be formalized in a separate agreement.

Mintiro warrants that it is free from any obligations that could interfere with the execution of this Agreement.

## 5. INTELLECTUAL PROPERTY AND CONFIDENTIALITY

The parties acknowledge that confidential information and intellectual property may be shared during this Agreement. Each party agrees that such information will only be used for purposes related to this Agreement and will not be disclosed without prior written consent, except as allowed under the terms of this Agreement.

Confidential information may only be shared with employees, agents, and consultants who need it to fulfill their obligations, and these individuals must agree to comply with confidentiality obligations.

If confidential information becomes public through no fault of the receiving party or if it was previously known or lawfully obtained from a third party, the receiving party will not be held liable for its disclosure.

Code: EDGMIH-1

These confidentiality provisions shall survive the termination of this Agreement.

## 6. TERMINATION

GOLD MINING LLC reserves the right to terminate this Agreement after conducting due diligence if unsatisfied. In this case, Mintiro shall refund all payments except non-refundable legal fees.

## 7. INDEMNITY

Each party shall assume liability for any damage to its property or injury to its employees, contractors, clients, or suppliers resulting from the performance of this Agreement.

## 8. GOVERNING LAW AND ARBITRATION

The State of California, USA's laws shall govern this Agreement. Any disputes arising from this Agreement shall first be resolved through good faith negotiations. If negotiations fail, the dispute will be submitted to arbitration under the California International Arbitration Rules, with arbitration to take place in Los Angeles, USA. The decision of the arbitrator shall be final and binding.

## 9. BREACH

In the event of a material breach of this Agreement, the non-breaching party may notify the defaulting party, allowing 30 days to remedy the breach. If the breach is not remedied, the non-breaching party may terminate the Agreement and pursue legal remedies.

Termination of this Agreement does not absolve either party of their confidentiality obligations.

## 10. FORCE MAJEURE

Neither party shall be liable for failure to perform their obligations due to events beyond their control, such as natural disasters, civil unrest, or other acts of God. Both parties will exercise due diligence to minimize the impact of such events and resume performance as soon as possible.

If the force majeure event persists for over six months, either party may terminate this Agreement.

## 11. DOMICILIUM AND NOTICES

The parties designate the following addresses for all communications and legal notices under this Agreement:

- **"Gold Mining LLC:"**

  30 N Gould St Ste R, Sheridan, WY 82801, USA
  Email: eonmining@gmail.com
  Phone: +1 307 219 9090

- **"Mintiro Investment Holdings (PTY) Ltd:"**

  9 Canyon Close, Highveld x 17, Centurion, Pretoria, South Africa
  Email: helo.afrika@gmail.com

Code: EDGMIH-1

Page **3** of **4**

Phone: +264-81-283-7064

Any changes to these details must be made in writing and will take effect upon receipt by the other party.

## 12. GENERAL

This Agreement constitutes the entire understanding between the parties. No changes, modifications, or waivers will be effective unless made in writing and signed by both parties.

Headings in this Agreement are for reference only and do not affect interpretation.

If any provision of this Agreement is unenforceable, the remainder shall remain in full force and effect.

The parties hereby agree to the terms of this Agreement and undertake to fulfill them.

For and on behalf of
**Gold Mining LLC**

_____
Alexander Dekhtyar
President
Date: October 18, 2024

For and on behalf of
**Mintiro Investment Holdings (PTY) Ltd**



_____
Thomas O'Brien Tolken
Director
Date:18/09/2024

Code: EDGMIH-1

Page **4** of **4**

# EXHIBIT B

"Equipment Lease Agreement"

# EQUIPMENT LEASE AGREEMENT

This agreement concluded on September 25, 2024, between:

**Mintiro Investment Holdings** (PTY) Ltd, located at 9 Canyon Close, Highland, Centurion Gauteng, South Africa, Reg. number 2018/550625/07, exporter/importer code 21900484, hereinafter referred to as "Lessor."

and

**Gold Mining LLC**, located at 9663 Santa Monica Blvd 688, Beverly Hills, CA 90210, USA, Reg WY 2020-000942129, hereinafter referred to as "Lessee."

This Equipment Lease Agreement ("Lease") is made and effective after the current user ("Lessee") signs the rental order and the payment of the rental invoice by the Lessee on the collection of the leased equipment, by and between Lessor and the Lessee, collectively referred to as the "Parties." The Lessor desires to lease to the Lessee, and the Lessee desires to lease from the Lessor specific tangible property described in "Addendum 1" to this agreement. Now, therefore, in consideration of the mutual covenants and promises hereinafter to set forth, the Parties hereto agree as follows:

1. **Lease**

The Lessor hereby leases to the Lessee, and the Lessee leases from the Lessor the following equipment (the "Equipment") described in the order. The Lessor warrants that the Lessor has the right to rent the equipment, as provided in this Lease.

2. **Lease Term, Rent and Deposit**

The term of this Lease shall commence on the start date when the Lessee will collect the shipment with the equipment in the US from the shipping carrier and shall expire after 30 calendar days upon the date of the first collection of the equipment if another date is not mutually amended by Lessor and Lessee. The rent for the Equipment shall be paid upon the end of the Lease based on the resulting length of the lease.

Parties agree that the shipping should be processed through a reputable international carrier to the address:

Andrew Osichnuk
11100 Strathern St 53
Sun Valley, CA 91352, USA

With instructions on how to pick up the shipment from the carrier's local warehouse.

3. **Use**

The Lessee shall use the Equipment carefully and adequately and shall comply with and conform to all national, provincial, municipal, police, and other laws, ordinances, and regulations of the Republic of South Africa ("South Africa") and the United States in any way relating to the possession, use or maintenance of the Equipment eliminating the conflict of the law.

4. **Repairs and Maintenance**

The Lessor, at its own cost, shall keep the Equipment in good repair, condition, and working order and shall furnish any parts, mechanisms, and devices required to keep the Equipment in good mechanical working order. The Lessee shall not repair or materially alter the physical or otherwise makeup of the Equipment in any way.

The Lessor checks the Equipment before the Lessee collects it. Suppose the Equipment appears damaged when the Lessee collects it. In that case, the Lessee must notify the Lessor immediately upon first inspection, and the Lessor will negotiate a mutually agreeable solution with the Lessee.

5. **Damage, Loss and Insurance**

The Lessee hereby assumes and shall bear the entire risk of loss and damage to the Equipment from any and every cause. The Lessee shall be responsible for maintaining insurance on the Equipment with losses payable to the Lessor against damage, loss, fire, theft, collision, and other such risks as are appropriate and specified by the Lessor.

In the event of damage of any kind whatsoever to the Equipment, the Lessee agrees to immediately contact the Lessor with an accurate description of the damage and the circumstances of its occurrence. The Lessee agrees to be bound, legally and otherwise, by the report of the Lessor's chosen repair venue as to the cause of the damage to the Equipment.

In the event of loss of any kind whatsoever to the Equipment, the Lessee shall notify the Lessor the same day of loss and, at the Lessor's option and whatever option is higher:

(ii) Replace the same with like equipment in good repair, condition, and working order; or

(ii) Pay to the Lessor the replacement cost of the Equipment.

6. **Out-of-Stock Equipment and Multiple Equipment Orders.**

The Lessor will make the Equipment available to the Lessor product as it becomes available. Where the Equipment the Lessee ordered is out of stock, delaying fulfilling the Lessee's order, the Lessor will keep the Lessee informed of any such Equipment and will negotiate a mutually agreeable solution with the Lessee.

For a multiple Equipment order, the Lessor will make every attempt to make all the equipment contained in the order available to the Lessee at the same time. Equipment that is unavailable at the time of collection may be collected as it becomes available unless the Lessee notifies the Lessor of their alternate wishes to this end.

7. **Surrender**

Upon the expiration or earlier termination of this Lease, the Lessee shall return the Equipment to the Lessor in good repair, condition, and working order, except for ordinary wear and tear resulting from proper use thereof alone. The Lessor's acceptance of the Equipment upon return by the Lessee shall not represent the Lessor's acceptance as to the condition of Equipment upon return, and the Lessor reserves the right to assess the condition of the Equipment.

8. **Taxes**

The Lessee shall keep the Equipment free and clear of all levies, taxes, duties, liens, charges, and other encumbrances. The Lessee shall report to the Lessor and pay and discharge all levies, taxes, duties, liens, charges, and other encumbrances arising from the Lessee's use or operation of the Equipment. If such are levied against the Lessor, the Lessee agrees to reimburse the Lessor in full for those charges.

9. **Indemnity**

The Lessee shall indemnify the Lessor against and hold the Lessor harmless from any claims, actions, suits, proceedings, costs, expenses, damages, and liabilities, including reasonable attorney's fees and costs, arising out of, connected with, or resulting from the Lessee's use of the Equipment. This specifically includes but is not limited to loss of data on the Equipment provided by the Lessor.

10. **Default**

Late returns are subject to a fee of two-thirds of the day's rental price at the time of hire per day.

11. **Ownership and Assignment**

The Equipment is, and shall at all times be and remain, the sole and exclusive property of the Lessor, and the Lessee shall have no right, title, or interest therein or thereto except as expressly outlined in this Lease.

The Lessee shall not assign or transfer this Lease or its interest in the Equipment without the prior written consent of the Lessor.

12. **Additional Documents**

If the Lessor requests it, the Lessee shall execute and deliver to the Lessor such documents as the Lessor deems necessary or desirable for purposes of recording or filing to protect the Lessor's interest in the Equipment, including, but not limited to, copies of an identity document or passport.

13. **Entire Agreement**

This Lease constitutes the entire agreement between the Parties and supersedes any prior understanding or representation preceding the date of this Lease. This Lease may be modified in writing and must be signed by the Lessor and the Lessee.

Headings used in this Lease are provided for convenience only and shall not be used to construe meaning or intent.

14. **Disclaimer**

Every effort is made to ensure that descriptions and prices are correct. The Lessor reserves the right to correct errors as needed. All prices and availability are subject to change without notice.

15. **Governing Law**

This Lease shall be construed and enforced according to the laws of South Africa and the United States, eliminating the conflict of law.

**LESSEE**
**Gold Mining LLC, USA**

_____
Alexander Dekhtyar, CEO
Date: 09/26/2024

_____
Andrew Osichnuk, CFO
Date: 09/26/2024

**LESSOR**
**Mintiro Investment Holdings Ltd. South Africa.**

_____
Thomas O'Brian Tolken, Director
Date:

ADDENDUM 1
to the equipment lease agreement

| Ln | Code | Description | Unit | Shipped | Serial Number | Weight |
|----|------|-------------|------|---------|---------------|--------|
| 1 | 202241 | DJI BS60 Intelligent Battery Station for M300RTK | Item | 1 | 1Z7JL6S5A10TJY | 0.00 |
| 2 | 202259 | DJI-D-RTK 2 | Item | 1 | 359BM4100100CF | 0.00 |
| 3 | 202260 | DJI-D-RTK 2 TRIPOD | Item | 1 | CM0000102744039F | 0.00 |
| 4 | M350 | DJI-MATRICE 350 RTK | Item | 1 | 1581F6GKB237300400CY | 0.00 |
| 5 | DJI-TERRA PRO 1Y1D A | DJI-TERRA PRO 1Y1D A | Item | 1 | TPvqOsjiSAGQWibymF | 0.00 |
| 6 | DJI-ZL2 | DJI-ZENMUSE L2 | Item | 1 | 6U3DM44005DPYE | 0.00 |
| 7 | TB65 | DJI-TB65 BATT | Item | 1 | 6JYPLC2DA002E5 | 0.00 |
| 8 | TB65 | DJI-TB65 BATT | Item | 1 | 6JYPLC2DA002GW | 0.00 |
| 9 | TB65 | DJI-TB65 BATT | Item | 1 | 6JYPLC2DA002HN | 0.00 |
| 10 | TB65 | DJI-TB65 BATT | Item | 1 | 6JYPLC2DA002J8 | 0.00 |
|  |  |  | Total |  | 10.00 | 0.00 |

Comments